INSD Pro Se Civil Rights Complaint (unrelated to imprisonment) 12/19 (adapted from AO Pro Se 15 (Rev. 12/16))

# UNITED STATES DISTRICT COURT

for the

## Southern District of Indiana

FILED

MAY 2 3 2023

U.S. CLERK'S OFFICE
INDIANAPOLIS, INDIANA

| | |
|---|---|
| **(see attached)** | Case No. _____ |
| _Plaintiff(s)_ | _(to be filled in by the Clerk's Office)_ |
| _(Write the full name of each plaintiff who is filing this complaint._ | |
| _If the names of all the plaintiffs cannot fit in the space above,_ | Jury Trial: _(check one)_ ☑Yes ☐No |
| _please write "see attached" in the space and attach an additional_ | |
| _page with the full list of names.)_ | |
| –v– | 1: 23-cv- 0889 SEB MG |
| **(see attached)** | |
| _Defendant(s)_ | |
| _(Write the full name of each defendant who is being sued. If the_ | |
| _names of all the defendants cannot fit in the space above, please_ | |
| _write "see attached" in the space and attach an additional page_ | |
| _with the full list of names.  Do not include addresses here.)_ | |

## COMPLAINT FOR VIOLATION OF CIVIL RIGHTS
### (Non-Prisoner Complaint)

---

### NOTICE

Federal Rule of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files.  Under this rule, papers filed with the court should _not_ contain: an individual's full social security number or full birth date, the full name of a person known to be a minor, or a complete financial account number.  A filing may include _only_: the last four digits of a social security number, the year of an individual's birth, a minor's initials, and the last four digits of a financial account number.

Except as noted in this form, plaintiff need not send exhibits, affidavits, grievances, witness statements, evidence, or any other materials to the Clerk's Office with this complaint.

In order for your complaint to be filed, it must be accompanied by the filing fee or an application to proceed in forma pauperis.

---

INSD Pro Se Civil Rights Complaint (unrelated to imprisonment) 12/19 (adapted from AO Pro Se 15 (Rev. 12/16))

**I.     Basis for Jurisdiction**

Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." Under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971)*, you may sue federal officials for the violation of certain constitutional rights.

**A.**     Are you bringing suit against *(check all that apply)*:

☐   Federal officials (a *Bivens* claim)

☑   State or local officials (a § 1983 claim)

**B.**     Section 1983 allows claims alleging the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." 42 U.S.C. § 1983. If you are suing under section 1983, what federal constitutional or statutory right(s) do you claim is/are being violated by state or local officials?

First and Fourteenth Amendment Rights

_____

_____

**C.**     Plaintiffs suing under *Bivens* may only recover for the violation of certain constitutional rights. If you are suing under *Bivens*, what constitutional right(s) do you claim is/are being violated by federal officials?

Not applicable

_____

_____

**D.**     Section 1983 allows defendants to be found liable only when they have acted "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983. If you are suing under section 1983, explain how each defendant acted under color of state or local law. If you are suing under *Bivens*, explain how each defendant acted under color of federal law. Attach additional pages if needed.

(See attached)

_____

_____

_____

_____

_____

_____

_____

INSD Pro Se Civil Rights Complaint (unrelated to imprisonment) 12/19 (adapted from AO Pro Se 15 (Rev. 12/16))

## II.    The Parties to This Complaint

### A.    The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

Name          **(see attached)**

Address

|  | City | State | Zip Co |
|---|---|---|---|

County

Telephone Number

E-Mail Address

### B.    The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation.  For an individual defendant, include the person's job or title (if known) and check whether you are bringing this complaint against them in their individual capacity or official capacity, or both.  Attach additional pages if needed.

Defendant No. 1

Name                        Penn-Harris-Madison School Corporation

Job or Title *(if known)*      public school corporation

Address                      55900 Bittersweet Rd.

| Mishawaka | IN | 46545 |
|---|---|---|
| City | State | Zip Code |

County                      St. Joseph

Telephone Number           (574) 259-7941

E-Mail Address *(if known)*

☐ Individual capacity    ☑ Official capacity

INSD Pro Se Civil Rights Complaint (unrelated to imprisonment) 12/19 (adapted from AO Pro Se 15 (Rev. 12/16))

**Defendant No. 2**

| | |
|---|---|
| Name | Penn-Harris-Madison School Board |
| Job or Title *(if known)* | public school board |
| Address | 55900 Bittersweet Rd. |
| | Mishawaka | IN | 46545 |
| | *City* | *State* | *Zip code* |
| County | St. Joseph |
| Telephone Number | |
| E-Mail Address *(if known)* | |

☐ Individual capacity    ☑ Official capacity

**Defendant No. 3**

| | |
|---|---|
| Name | Katie Jenner |
| Job or Title *(if known)* | Indiana Secretary of Education |
| Address | 100 N. Senate Ave., 9th Floor |
| | Indianapolis | IN | 46204 |
| | *City* | *State* | *Zip Code* |
| County | Marion |
| Telephone Number | (317) 232-6610 |
| E-Mail Address *(if known)* | |

☑ Individual capacity    ☑ Official capacity

INSD Pro Se Civil Rights Complaint (unrelated to imprisonment) 12/19 (adapted from AO Pro Se 15 (Rev. 12/16))

## III.    Statement of Claim

State as briefly as possible the facts of your case.  Describe how each defendant was personally involved in the alleged wrongful action, along with the dates and locations of all relevant events.  You may wish to include further details such as the names of other persons involved in the events giving rise to your claims.  Do not cite any cases or statutes.  If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph.  Attach additional pages if needed.

A.    Where did the events giving rise to your claim(s) occur?

The teaching of the Theory of Evolution

B.    What date and approximate time did the events giving rise to your claim(s) occur?

2018-2021

C.    What are the facts underlying your claim(s)? *(For example:  What happened to you?  Who did what?  Was anyone else involved?  Who else saw what happened?)*

(See attached)

INSD Pro Se Civil Rights Complaint (unrelated to imprisonment) 12/19 (adapted from AO Pro Se 15 (Rev. 12/16))

## IV.    Injuries

If you sustained injuries related to the events alleged above, describe your injuries and state what medical treatment, if any, you required and did or did not receive.

(See attached)

## V.    Relief

State briefly what you want the court to do for you. Make no legal arguments. Do not cite any cases or statutes.  If requesting money damages, include the amounts of any actual damages and/or punitive damages claimed for the acts alleged.  Explain the basis for these claims.

(See attached)

## VI.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be  served.  I understand that my failure to keep a current address on file with the Clerk's Office may result  in the dismissal of my case.

Date of signing:    5/23/23

Signature of Plaintiff

Printed Name of Plaintiff    Jennifer Reinoehl

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| JENNIFER REINOEHL, | ) |
| | ) |
| JASON REINOEHL, | ) |
| | ) **Case No.** |
| SARAH REINOEHL | ) |
| PLAINTIFFS | ) |
| | ) |
| v. | ) |
| | ) |
| PENN-HARRIS-MADISON SCHOOL | ) |
| CORPORATION, | ) |
| | ) **DEMAND FOR JURY TRIAL** |
| PENN-HARRIS-MADISON SCHOOL | ) |
| BOARD, | ) |
| | ) |
| and KATIE JENNER, in her official and | ) |
| individual capacity, | ) |
| DEFENDANTS | ) |

## VERIFIED COMPLAINT

Now comes JASON REINOEHL, JENNIFER REINOEHL, and SARAH REINOEHL

(collectively herein "Plaintiffs"), on behalf of themselves, pro se, and bring this Complaint

against Defendants Penn-Harris-Madison School Corporation, Penn-Harris-Madison Corporation

School Board, and Katie Jenner, Indiana Secretary of Education (collectively herein

"Defendants").

## I.     PARTIES TO THE COMPLAINT

### A. The Plaintiff

1.      Jennifer Reinoehl resides at 51860 Cheryl Dr., Granger, St. Joseph County, IN, 46530

1

with phone number: 574-302-6088.

2.    Jason Reinoehl resides at 51860 Cheryl Dr., Granger, St. Joseph County, IN, 46530 with

phone number: 574-302-6088

3.    Sarah Reinoehl resides at 51860 Cheryl Dr., Granger, St. Joseph County, IN, 46530 with

phone number: 574-302-6088

**B. The Defendants**

4.    Penn-Harris-Madison School Corporation is a public school corporation in the State of

Indiana with a School Board, also named as defendants, whose corporation office is located at

55900 Bittersweet Rd., Mishawaka, IN, 46545 and whose phone number is (574) 259-7941.

There are approximately 11,500 students in the district and about 4,000 attend Penn High

School.

5.    Katie Jenner is the current Indiana Secretary of Education and the head of the Indiana

Department of Education, a state government office located at 100 N. Senate Ave., 9th Floor,

Indianapolis, IN, 46204 and with phone number (317) 232-6610. As the head of the Indiana

Department of Education she is responsible for the curriculum taught in Indiana public schools.

She is being sued in her individual and official capacities.

## II.    BASIS FOR JURISDICTION AND VENUE

6.    The U.S. District Court for the Southern District of Indiana has subject matter jurisdiction

over this action pursuant to 28 U.S.C. §1331 and §1343, which provides Federal Courts have

jurisdiction over cases involving a federal question—U.S. Constitutional Rights granted under

the 1st and 14th Amendments of the U.S. Constitution, 42 U.S.C.§1983, and the Declaratory

Judgement Act, 28 U.S.C. §2201 and §2202.  This Court has supplemental jurisdiction over

plaintiffs' cause of action arising under the Indiana Bill of Rights, Article 1, Section 3, pursuant to 28 U.S.C. §1367.

7.     Venue is proper because under 28 U.S. Code §1391(b) because one or more defendants reside in this District, and all defendants reside in the State of Indiana and the events or omissions giving rise to the claims at issue originated in this District.

8.     An actual and justiciable controversy exists between the parties.

### III.   STATEMENTS OF FACTS

9.     Jason and Jennifer Reinoehl live within the Penn-Harris-Madison School Corporation public school district.

10.    Sarah Reinoehl also lives within the Penn-Harris-Madison School Corporation public school district.

11.    Jason and Jennifer Reinoehl are parents of Jason Reinoehl II, Samuel Reinoehl, Sarah Reinoehl, and L.R. who have attended Grissom Middle School, Discovery Middle School, and Penn High School—public schools run by the Penn-Harris-Madison School Corporation.

12.    Jason and Jennifer Reinoehl are also the parents of T.R., who is currently too young to attend high school, but whom Jason and Jennifer Reinoehl expect to transition into Penn High School as they have done with each of their other children.

13.    At all times alleged herein, defendants were acting under color of state law.

14.    Penn High School teaches, in accordance with Indiana Department of Education guidelines, the state-sponsored, atheistic, religious Theory of Evolution (herein "evolution") and the state-sponsored, atheistic, religious Big Bang Theory under the guise that they are "science."

15.    The Theory of Evolution, often associated with Charles Darwin, states that all known life descended from one, common, original ancestor. The National Academy of Sciences summarizes

the Theory of Evolution as follows:

> "Biological evolution concerns changes in living things during the history of life on earth. It explains that living things share common ancestors. Over time, evolutionary change gives rise to new species. [Charles] Darwin called this process 'descent with modification,' and it remains a good definition of biological evolution today."

16.     This statement was made with the knowledge that the Theory of Evolution breaks many other scientific laws and theories as well as defies observation since no species (as that term is scientifically defined) has ever been observed to change into another, "new species." This definition also carefully avoids stating that the original organism from which all others had to have descended had to have arisen spontaneously—which in itself violates scientific laws. Most scientists, when presented with the arguments contained within this Complaint, admit that the Theory of Evolution is highly flawed as a scientific theory. However, since they have been indoctrinated with it while attending public schools and universities, they are reluctant to abandon this religious teaching.

17.     Even though the Theory of Evolution has been scientifically disproven, it is continued to be taught in public schools as "scientific truth" concerning the origins of the universe and species.

**A.  Hypothesis Criteria Required For True Science**

18.     All scientific laws and theories must be a scientific hypothesis and meet the criteria for a scientific hypothesis.

19.     Scientific hypothesis, including those for scientific theories, must meet specific requirements including that they must be testable and that they must be falsifiable. In other words, "There are other inhabited planets in the universe" is not a scientific hypothesis because we cannot falsify it. We cannot send humans or probes to every other planet in the universe.

Even if we sent a probe to a planet and potentially found life, not finding life would not falsify the hypothesis because not finding life does not mean it does not exist. Therefore, it is not a scientific hypothesis because it is not falsifiable.

20.     Another example of a statement that does not meet the criteria for a scientific hypothesis is, "Our universe is surrounded by another larger universe that it is impossible for us to contact" because if we cannot contact the universe, we cannot test that it exists.[1]

21.     Because scientific hypothesis must be both testable and falsifiable, they cannot reference supernatural—which behaves unpredictably and therefore cannot be tested. Saying the God of the Bible created humans is not testable, just as saying Nature (also known as the god Gaia among other names) created humans is not testable. There is no test we could conceive that would require either God or Nature to perform an act of creation for us. Further, even if we did discover a way to test if God or Nature created humans, performing the test without success would not falsify our hypothesis since other factors might have been present at the time of humans' creation of which we were unaware.

22.     Although there is nothing wrong with making observations and coming up with theories that sound plausible based on those observations, most theories derived from this method are incorrect. This is why theories must be testable in order to become a scientific hypothesis and they must survive repeated testing to become actual science.

23.     For example, about a century ago, it was observed that DNA found in every living cell only had four nucleotides, whereas proteins were made up of 22 amino acids. Based on this observation and mathematical calculations, proteins were thought to be the genetic material. Scientists believed, without experimentation, that only four nucleotides would not be enough to

---

[1] http://www.batesville.k12.in.us/physics/phynet/aboutscience/hypotheses.html

pass on all the information needed in a genome. It was not until Hershey and Chase performed an experiment disproving this theory and showing DNA was the genetic material. Scientists did not believe their results, and so Hershey and Chase had to perform a second, different experiment that verified their results. Repeatedly testing a hypothesis or theory and achieving the same results is important in determining the validity of a hypothesis.

24.     Another more recent example concerns artificial or non-nutritive sweeteners. It was known that artificial or non-nutritive sweeteners had no calories and provided a sweet taste similar to sugar. From this, scientists believed, without experimentation, that replacing sugar with these substitutes in foods and beverages would help people lose weight. In the decades since the first artificial or non-nutritive sweetener was introduced, more people began drinking these "diet" beverages but obesity also increased during this time period.[2] Slowly, experiments began showing that artificial or non-nutritive sweeteners increase weight gain despite the fact they contain no calories.

**B. The Big Bang Theory**

25.     One scientifically disproven theory Sarah Reinoehl and L.R. were taught as truth by Penn High School in accordance with Indiana Department of Education Guidelines was that the Universe originated in a giant explosion referred to as the "Big Bang Theory."

26.     Where the energy in the Universe came from is a question for religion because there is no way to test it, and the creation of matter and/or energy violates the Law of Conservation of Mass/Energy—which states mass/energy cannot be created or destroyed, it can only change forms, including but not limited to changing from mass to energy. The Law of Conservation of Momentum (Newton's First Law) states that momentum is conserved—if something is

---

[2] https://www.cdc.gov/nchs/products/databriefs/db109.htm

unmoving, it will remain unmoving.

27.    Scientific experiments support the above laws, which have been tested for centuries.

28.    What is known as the Big Bang Theory was proposed based solely on the observation that galaxies outside our own appeared to be moving away from us at a measurable rate. From this simple observation an epic-length mythology on universe origins was written to support atheist origin views, and it was rewritten whenever observed evidence was different than prior predictions.

29.    For example, those supporting this theory, theorized, in opposition to conservation of momentum, that the initial explosion released material quickly, but then rapidly slowed and remained unchanged at the current rate for 13 billion years. In space, there is no friction or drag to slow particles down. However, the rate at which the universe is expanding is extremely slow and not at the speed that a massive explosion would have perpetuated. For this reason, instead of following the observed laws of physics, atheists created an untestable mythology in opposition to scientific laws.

30.    Based on Newton's First Law and the fact that space—especially a matterless primordial space—is a vacuum, the initial explosion rate would have never been altered since there would be no reason for it to have slowed. This mythology also violates known physics rules about explosions, such as that they generate uneven pressure and an explosion as large as one needed for the Big Bang to have occurred would have created varying rates of acceleration, instead of the observed steady rate of all bodies in the universe. We also can observe that if this explosion happened, it eventually generated different sizes and densities of planets, stars, black holes, and other celestial bodies. According to know physics laws and particle behavior, including theories of gravitation, different sized bodies would move at different rates if their acceleration originated

from the same place. This varying behavior is not observed.

31.     Finally, what we observed with the Hubble telescope is that all the objects are moving away from all other objects in the universe. Not only does this defy gravitation—larger objects in proximity to smaller ones attract them—but if there was one central explosion that accelerated all these objects, they would all be moving away from that singular point, and we could discern that point or at least theorize its location. We cannot.

32.     Advocates of the Big Bang predicted there would be a cosmic microwave background that would be uniform and of a uniform temperature. When these advocates discovered and photographed it, they were awarded the Nobel Prize for "proving" the Big Bang Theory. However, it was soon found out that the cosmic microwave background was not a randomly formed uniform background with little temperature variation as necessary to support the Big Bang Theory. Instead, the background directly correlates with the plane of our Milky Way Solar System. It also has greater temperature fluctuations across it than what would be allowed by the Big Bang Theory, including both warm and cold spots. Even though the cosmic microwave background that was discovered disproved the Big Bang Theory because it did not meet the predicted requirements, children are still taught the Big Bang is truth. Instead of accepting the facts, atheistic scientists ignore them.

33.     In science, energy cannot be created or destroyed. The energy required to start a massive explosion would have had to have been spontaneously created in violation of this scientific law. Evolutionist try to get around the laws of thermodynamics by stating the energy was there and "transformed," but again, energy cannot spontaneously transform according to scientific laws and experiments that supported those laws. Scientifically, some action had to cause this transformation according to the Third Law of Motion.

34.     Just as it would be impossible to go back in time and observe how the universe was created, it is equally impossible to form a hypothesis that can be disproven that explains how the universe spontaneously exploded—especially when atheist scientists are biased enough to overlook data disproving their theory. These theories also cannot be tested. There is no way to meaningfully recreate any origin event considering the vastness of the universe and the earth's relative smallness.

**C. Spontaneous Generation**

35.     Another scientifically disproven theory Sarah Reinoehl and L.R. were taught as truth by Penn-Harris-Madison School Corporation in accordance with Indiana Department of Education Guidelines was that biological organisms spontaneously arose from Chemical Evolution.

36.     Louis Pasteur had disproven Spontaneous Generation in an experiment started in 1859 and continuing until the present time. Simply renaming "Spontaneous Generation" into "Chemical Evolution" does not change the fact Pasteur definitively disproved the theory.

37.     In the case of Chemical Evolution, to support their disproven hypothesis, evolutionary atheists, who are notably sentient beings, will mix various chemicals together in a test tube and use electricity to infuse energy into the system. Although the scientists selected the chemicals based on their sentient knowledge of biological organisms and added electricity instead of other forms of energy to "mimic" lightning, never once has life been observed to form spontaneously in these experiments. Nor can these scientists do any more than create individual pieces of biological agents, such as proteins, DNA, lipids, etc. They, with all their knowledge cannot and have never created a working cell from only chemical precursors. This further supports Pasteur's experiment disproving the hypothesis that life can arise spontaneously.

38.     The Theory of Chemical Evolution is in direct conflict with Cell Theory, which states, "All cells come from preexisting cells created through the process of cell division." Unlike the Theory of Chemical Evolution, which has never been observed, Cell Theory is easily observed and has been observed repeatedly. Never has life been observed to spontaneously or chemically arise in nature.

**D. Dating Systems**

39.     The Penn-Harris-Madison School Corporation teaches and the Indiana Department of Education requires all Indiana public schools to teach students, including but not limited to LR. and Sarah Reineohl, that the universe, the Earth, and biological life itself has a history of billions and millions of years.

40.     This teaching is based on mathematical calculations, including one theoretical paper published in the 1970s about geological methods of dating. At no time has the data in that paper, which was based purely on mathematical calculations and not actual experimental data, been experimentally tested.

41.     Many geological dating methods are based on half-lives that are too long to test in order to determine if the decay remains steady under various stresses, such as high temperature or excessive pressure. Testing that has been performed has shown decay rates are not steady and can be influenced by environmental factors.

42.     Geological dating methods also rely on knowing the accurate composition of the item being tested when it was formed. It is impossible for scientists to go back in time and observe or measure the composition of the item at its genesis.

43.    Things, such as newly formed rock, do not return expected results. Instead of geological dating results consistent with a new rock's age, the testing inaccurately shows the rock is millions of years old.

44.    Further proof these methods are unreliable show in that the "predicted" age of the universe and earth changes over the decades.

45.    The above disproves the hypothesis that radiometric testing is an accurate measure of age. Still, Defendants continue to teach and cause to be taught that radiometric testing is a scientifically accurate measure of age.

### E.  The Fossil Record

46.    Another disproven aspect of the Theory of Evolution L.R. and Sarah Reinoehl were taught as truth by Penn High School in accordance with Indiana Department of Education Guidelines was that the fossil record shows single celled organisms gradually mutating into multi-celled organisms. This theory, originally called "Transmutation" was scientifically disproven in the 1800s prior to Charles Darwin renaming it "evolution."

47.    Upon examining the fossil record, one finds the "earliest" fossils are those of algae mats. Contrary to what the Defendants teach and require to be taught, these organisms did not mutate into something that was better suited to its environment. In fact, these algae mats were and have always been best suited to their environment since they still exist today and can be found in Australia. In fact, many of the "precursor" fossil animals that are found "early" in the fossil record also still exist today. There was never a reason for them to mutate because they were fit as they were initially found in the fossil record.

48.    In addition, looking at the entire fossil record, you do not find a gradual change that occurs slowly over time. Instead, you find numerous organisms in the exact same few layers and

then huge gaps that would amount to millions of years if radiometric testing could be trusted—with absolutely nothing in them. After that, you will find another few layers, with numerous organisms. These layers are not necessarily organized with single-celled organisms in the bottommost layers and more complex organisms in layers higher up.

49.     The dangers of making non-scientific assumptions about fossils found in the record that cannot be tested and treating them as if they were a scientific hypothesis—or worse, scientific "truth"—is evident in the history of the coelacanth. The coelacanth with its lobed fins was long believed, based solely on the look of its fossil, as being the first fish to crawl out of the ocean. This religious belief was not based on scientific hypothesis or experimentation. It was solely based on how the fish looked. The fish was also thought to be extinct.

50.     When the fish was discovered to be not extinct, it was also discovered that it could only survive in the deep oceans. There was and is absolutely no possible way that this fish could have ever crawled out of the water and become the first amphibious organism on earth. Once this discovery was made, atheistic evolutionists found another similar looking fish fossil with lobed fins and again claimed that was the fish that first climbed out of the sea. There is no scientific evidence that fossil is nothing but another coelacanth.

**F.  Speciation**

51.     The Penn-Harris-Madison School Corporation teaches and the Indiana Department of Education requires all Indiana public schools to teach students, including but not limited to L.R. and Sarah Reineohl, that morphological features can determine if two or more animals belong to the same species.

52.     In *McLean v. Arkansas Bd. of Ed.*, 529 F. Supp. 1255 (E.D. Ark. 1982), the Court stated in opposition to the Intelligent Design theorists' similar term "kind":

> "[T]here is no scientific definition of "kinds" and none of the witnesses was able to point to any scientific authority which recognized the term or knew how many "kinds" existed. One defense witness suggested there may be 100 to 10,000 different "kinds". Another believes there were "about 10,000, give or take a few thousand."

This was one reason given for denying that Creationism/Intelligent Design were scientific theories.

53.     Although scientists have clearly defined "species" as: "a group of organisms that share a genetic heritage, are able to interbreed, and to create offspring that are also fertile," scientists do not adhere this definition.

54.     For example, in the cases of dinosaurs, where it is impossible to test if one extinct, fossilized animal bred with another and produced fertile offspring, scientists solely use morphological similarities—with one scientist finding similarities and another not finding them.

55.     Because the fossil record does not support transmutation or "evolution" as it is now called, when Charles Darwin wrote his primary evolutionary texts, he relied not on the fossil record but instead on physical similarities and differences between, what he deemed to be eighteen Galapagos finch "species" even though these finch "species" all successfully interbreed, as well as interbreed with other "species" from the mainland, and therefore are the same species according to the scientific definition of "species." The primary morphological differences between these "species" are their beaks. This would be the equivalent of saying that humans with different nose shapes are different species—regardless of their ability to produce fertile offspring together. Despite knowing these birds breed with each other and produce fertile offspring, they are still considered and named as different "species" today.

56.     Darwin's finches on the Galapagos islands and surrounding areas show that morphological differences have no bearing on whether or not the animal is the same or different

species according to the scientific definition. Despite this, in, for example, the case of flies, one fly is considered a different species simply because the pattern of veins on its wings is different than that of another fly—another morphological difference. In the case of mice (Peromyscus crinitus and Peromyscus hooperi), one mouse is considered a different species because it lives on the opposite side of the Grand Canyon—it is location that scientists have used instead of whether or not these two "species" could produce fertile offspring as the definition of species requires.

57.     Worse than these cases, where the animals are never examined to see if they can produce fertile offspring, is the case where scientists know two animals can produce fertile offspring but insist on labelling them as different species. For example, lions (*Panthera leo*) and tigers (*Panthera tigris*) are known to be able to produce fertile offspring, but scientists have still classified them as different species in the same genus because a cross has not yet been found in the wild.

58.     On the other hand, domestic dog breeds are all considered the same species—*Canis lupus familiaris*—despite the fact no cross between a Pomeranian and Husky has been found in the wild.

59.     If scientists themselves do not clearly follow the definition of species, especially when this definition is well-written, objective, and testable, and instead resort to subjective, untestable variances from that definition, then the definition of "species" is just as meaningless and unscientific as the Intelligent Design scientist's "kind."

60.     Further, since the Theory of Evolution is based on one species changing into another "new species," not following the scientific definition allows the supporters of the atheistic religious Theory of Evolution to claim new species are regularly observed and created whenever they find a different variation of a known animal.

### G. Spontaneous Abortion

61.     The Penn-Harris-Madison School Corporation teaches and the Indiana Department of

Education requires all Indiana public schools to teach students including but not limited to L.R.

and Sarah Reineohl, that one species changes or evolves into another species and all evolved

from a single, common ancestor (that had to have appeared through spontaneous generation).

62.     However, it is known by scientific geneticists that it would be impossible for one species

to mutate into another species. Every species from bacteria to humans have a set defined number

of mutations that can occur in their DNA. Any living thing that varies from the allowed

mutations will be spontaneously aborted. For example, in humans, three copies of chromosome

13 or three copies of chromosome 18 or three copies of chromosome 21 or three copies of the

sex chromosomes are all viable. Three copies of the remaining 19 chromosomes result in death

and spontaneous abortion within the first month of pregnancy. Although there are numerous

viable mutations—the overall number and kind is set for all organisms.

63.     All geneticists are aware of the limitations of genetic manipulation. When they make

small purposeful mutations to organisms, such as when they put a single human eye gene into a

fly, they hide these mutations from the fly's natural detection safeguards so it does not

spontaneously kill itself. They also refrain from making too many genetic edits because it would

be impossible to hide them all. When too much foreign DNA is introduced, even into bacteria,

the organism will kill itself.

64.     These facts are all well-known and discussed in undergraduate college science classes.

All the Defendants played an equal role in the pain and suffering Plaintiffs endured, by forcing

Jason and Jennifer Reinoehl's children, including but not limited to Sarah Reinoehl, to learn and

cite as truth religious origin stories that were different from those in which they believe in

violation of the 1st and 14th Amendments of the U.S. Constitution and the Indiana Bill of Rights, Article 1, Section 3.

### H. Facts

65.    Indiana Department of Education Guidelines mandate the atheist's religious myth of evolution is taught in all Indiana public schools and students are tested to confirm their knowledge of the subject.

66.    For example, 2016 Biology guideline B.5.1, which applies to 9th grade students, states:

> "Evaluate anatomical and molecular evidence to provide an explanation of how organisms are classified and named based on their evolutionary relationships into taxonomic categories."

67.    Anatomical and molecular similarities are not the basis of how species are defined—it is whether or not animals can reproduce viable offspring that can then reproduce viable offspring that determines whether or not something is the same species—the scientific taxonomic category upon which all the other taxonomic category definitions are based. If structural similarities defined taxonomic relationships, platypus would be closely related to ducks. Scientific taxonomy does not even place ducks and platypus in the same phylum—which is one of the highest tiers of taxonomic classification (as opposed to species which is one of the lowest tiers).

68.    The 2016 Biology guideline B.5.2, which applies to 9th grade students, states:

> "Communicate scientific information that common ancestry and biological evolution are supported by multiple lines of empirical evidence including both anatomical and molecular evidence."

69.    Again, this standard requires students to compare morphological features and if any similarity can be found, the student is to declare that supports the atheistic origin myth of evolution. This is not testing to see if one can evolve into another and is not based in science. Semi-trucks and houses are both rectangular and can hold things inside them. That does not mean one evolved from the other or that they had a common ancestor. If we had lost all

documentation of how semi-trucks came into being there would be absolutely no way to develop

a scientific test to discover whether or not they had evolved from houses.

70.     The 2016 Biology guideline B.5.3, which applies to 9th grade students, states:

> Apply concepts of statistics and probability to support a claim that
> organisms with an advantageous heritable trait tend to increase in
> proportion to organisms lacking this trait.

71.     Students are required to use statistics and probability to *prove* the Theory of Evolution,

when hypothesis are supposed to be tested by attempting to disprove them. At no point are

students asked to determine the probability or statistical likelihood that about 2.7 million DNA

nucleotides floated together in the estimated 321,003,271 cubic mile ocean in a way that was

meaningful to conducting life for a cyanobacteria, and after doing so random sets of 63-100

RNA nucleotides formed in clumps in within 0.8 micrometers of that DNA and these formed in

sequences that were meaningful to performing the duties of mRNA, tRNA, and rRNA, and that

in that same 0.8 micrometers a sufficient number of enzymes and proteins that necessary for any

life function also spontaneously formed or arrived at the exact same time as the rest and then

some spontaneously formed into carboxysomes, some proteins spontaneously formed around gas

bubbles that also would have had to been in that same place at that same time and created gas

vacuoles and then layers of chlorophyll bearing molecule membranes bound together in that

same place at that same time surrounding the other required ingredients for basic cell function,

and 37,000 DNA nucleotide base pairs also would have gathered in that 0.8 micrometer spot of

the ocean and came together in a way that created the functioning mitochondrial directions, and

themselves in that same membrane before it spontaneously closed itself to the rest of the ocean.

This is only a small detail of everything that would have had to have happened at exactly the

same moment if Chemical Evolution occurred.

72.     Instead of the above real numbers and real situation that had to have existed in order for

Chemical Evolution to have occurred (and without Chemical Evolution there would have been

no life form that existed to evolve into anything else), students are given one or two traits to

work with and fabricated numbers and fabricated scenarios on which to carry out their

probability and statistical analysis—which, not surprisingly, is designed to convince students the

atheist's religious version of creation is true. Teaching students to be biased and "prove" a

hypothesis is not science and is a scientific fallacy scientists try to prevent.

73.     The 2016 Biology guideline B.5.4, which applies to 9th grade students, states:

> "Evaluate evidence to explain the role of natural selection as an
> evolutionary mechanism that leads to the adaptation of species, and
> to support claims that changes in environmental conditions may
> result in: (1) increases in the number of individuals of some
> species, (2) the emergence of new species over time, and/or (3) the
> extinction of other species.

74.     "Nature" is defined as phenomena of the physical world collectively. To "select"

something means to carefully choose the most suitable item. Nature is not a sentient being—

although the ancient Greeks and many cultures do worship Nature (i.e. Gaia or Mother Nature

among other names). If the scientific definition of species is adhered to, there has never been a

"new species" because no living being from bacteria to humans can give birth to a living being

that is outside a set, small amount of variation.

75.     The 2016 Biology guideline B.5.5, which applies to 9th grade students, states:

> Construct an explanation based on evidence that the process of
> evolution primarily results from four factors: (1) the potential for a
> species to increase in number, (2) the heritable genetic variation of
> individuals in a species due to mutation and sexual reproduction,
> (3) competition for limited resources, and (4) the proliferation of
> those organisms that are better able to survive and reproduce in the
> environment.

76.     Again, the standard requires students begin with a belief that evolution is true and search for ways to support that claim. This is not science nor is it what scientists are supposed to do. (1) Although many species, such as the Giant Panda, have low reproductive rates and only produce five to eight cubs in a lifetime, humans also have low reproductive rates and currently are only producing two to three children (worldwide average) during their lifetime. Humans, despite their low reproductive rate, are not on the verge of extinction and their population is generally believed to be increasing. (2) Genetic mutations are not always heritable. This is especially true if the mutation is too different from the parent and results in a spontaneous abortion. For example, neither cervical cancer nor lung cancer—both mutations induced by environmental factors—are heritable. Finally, as stated above, the original algae found in the "earliest" fossils was the best able to survive and reproduce in the Earth's environment since it was originally formed and it has done so. There was no reason for other mutations of it to have survived and turned into anything else.

77.     The 2016 Biology guideline B.5.6, which applies to 9th grade students, states:

> Analyze and interpret data for patterns in the fossil record and
> molecular data that document the existence, diversity, extinction,
> and change of life forms throughout the history of life on Earth
> under the assumption that natural laws operate today as in the past.

78.     For this exercise, the natural laws that operate today—including that organisms which mutate to far from their parents are spontaneously killed before they can develop—is ignored. The actual fossil record, which does not show a natural progression from one organism to another but instead shows a variety of organisms and then has hundreds of layers without any organisms in it at all is also ignored. Instead of actual fossil records, students are given fabricated records. They are also given hand drawings, instead of actual pictures, of chickens, dogs, humans and other animals in a fetus stage. Although photographs show differences, the hand drawings

are rough and made to look like each other to encourage biased comparisons that lead to the preconceived conclusion they are almost identical.

79.    During the 2018-2019 school year, Sarah Reinoehl was a 9th grade student at Penn High School, a Penn-Harris-Madison School Corporation school located in Indiana and was taught the atheist Theory of Evolution as if it were scientific truth, including but not limited to the above guidelines, which are against her religious beliefs as a Christian.

80.    During the 2019-2020 school year, L.R. was a 9th grade student at Penn High School, a Penn-Harris-Madison School Corporation school located in Indiana and was taught the atheist Theory of Evolution as if it were scientific truth, including but not limited to the above guidelines, which are against her religious beliefs as a Christian.

81.    Plaintiff Sarah Reinoehl and her parents Jason and Jennifer Reinoehl suffered emotional pain and suffering because Defendants violated their Constitutional Rights.

## IV.    **ARGUMENT**

82.    Just as changing the name of Spontaneous Generation to Chemical Evolution does not make it a viable scientific hypothesis, changing the name of Atheism to Evolution does not make it any less a religion. Evolution is a non-scientific belief, made in opposition to the known, tested, and observed laws of science. It bestows upon "nature" both intelligence and supernatural power to select and discern one animal from another. Evolution is inherently a religious origin myth, argument, or assertion that falls outside the realm of science. It is neither scientific nor a testable theory in the scientific sense.

83.    Since the time of ancient Greece, when the atheist philosopher Thales first proposed an evolutionary theory because he did not believe in the Greek gods (something referenced in Plato's Apologia). It has been recycled throughout the centuries as an atheist alternative to how

life began.

84.     The Indiana guidelines require students not to scientifically attempt to disprove the

Theory of Evolution, but instead to find morphological similarities, ignore scientific laws, and

use fabricated information to support the belief.

85.     The effect of the Indiana Department of Education's guidelines is that public school

science teachers are compelled to present to their students in biology class information that is

inherently religious, not scientific, in nature. This is a clear and direct violation of the First

Amendment's Establishment Clause, which prohibits the teaching or presentation of religious

ideas in public school science classes. The Plaintiffs, parents and child in the Penn-Harris-

Madison School District, bring this lawsuit to enforce their rights under the Constitution of the

United States. As their remedy, the plaintiffs seek a declaration that the defendants' evolution

teaching guidelines violates the Constitution of the United States. They also seek an injunction to

prevent such violations and damages.

86.     "Families entrust public schools with the education of their children, but condition their

trust on the understanding that the classroom will not purposely be used to advance religious

views that may conflict with the private beliefs of the student and his or her family. Students in

such institutions are impressionable and their attendance is involuntary. See, e. g., *Grand Rapids

School Dist. v. Ball*, 473 U.S. 373, 383 (1985); *Wallace v. Jaffree*, 472 U.S. 38, 60 , n. 51 (1985);

*Meek v. Pittenger*, 421 U.S. 349, 369 (1975); *Abington School Dist. v. Schempp*, 374 U.S. 203,

252 -253 (1963) (BRENNAN, J., concurring*)" Edwards v. Aguillard*, 482 U.S. 578.

87.     Under the first amendment, the Supreme Court has ruled that even generic prayers, which

offend atheists, cannot be led by public school teachers in schools. *Engel v. Vitale*, 370 U.S. 421

(1962). Similarly, tenants of Atheism that specifically deny there is any God that created things

in six days and that speak about origins of life and the universe are offensive to Christians. In this case, students do not have the ability to opt out of these teachings. If generic prayers that offend atheists cannot be said, atheist origin myths cannot be taught as if they are scientific truth when they are not.

88.     The Eastern District of Arkansas—*McLean v. Arkansas Bd. of Ed.*, 529 F. Supp. 1255 (E.D. Ark. 1982)—ruled that since "kind" is not clearly defined in the Intelligent Design Theory, it cannot be taught alongside Evolution because it is a religion and the term "kind" was only found in the Biblical creation story and the Bible is the founding document for Christianity. This ruling was later referred to and cited with approval by the Supreme Court in *Edwards v. Aguillard*, 482 U.S. 578 (1987)

89.     However, Evolutionist also do not follow the clearly defined scientific meaning of "species" and classify animals as if they are different "species" when according to the clear definition, they are in fact the same species. They do this because the in the Origin of Species, the founding book for evolution, Charles Darwin did not follow the clear, scientific definition of "species." Had he done so, his theory would have been immediately refuted since it was not one "species" mutating into another that he observed, but instead variations of the same species. By the Court's precedent for Intelligent Design, evolution, is also a religion and not science and cannot be taught in schools.

90.     Evolution is a belief that the origin and development of living organisms came into being outside of observed laws and scientifically known limitations on genetic variation. Stating that the universe and everything in it came about in a way that is in opposition to scientific laws and known scientific facts, but refusing to attribute those deviations to an intelligent creator is the central tenet of traditional atheistic religions. As such, evolution is inherently religious.

91.     Evolution promotes positions taken by advocates of Atheism, who continuously attack public institutions for having any semblance of Christianity, despite the fact that the Founding Fathers and those governing the United States for the first 100 years of its existence allowed not only things such as school prayer but also things such as reading the Bible and its creation story in public schools.

92.     Despite having all the tenets of atheistic religious belief and failing to follow scientific laws, those supporting evolution refuse to admit it is a religion and instead claim that any religion, including Christianity, can fit into it. A clear reading of Genesis 1, which states the Universe and everything in it was created in six days, refutes that the Judeo-Christian origin belief and evolution can be superimposed. Because the atheist Theory of Evolution specifically attacks the Judeo-Christian origin story, it has the purpose and effect of advancing the atheist religion and results in the entanglement of the state with religion—as would any philosophy or theory about the origin of the universe and life.

93.     When the Theory of Evolution was first proposed and first taught in schools, it was taught alongside eugenics—another topic that was once boasted to be science but now considered pseudoscience. Just as eugenics—or the purifying of the human race—has been removed from public school science curriculum, evolution, another pseudoscience upon which eugenics was founded, also needs to be removed from it.

94.     Jason and Jennifer Reinoehl and their children, including but not limited to Sarah Reinoehl, are Christians. They believe that a sentient God created the universe and all life within it. Religiously teaching life and the universe arose spontaneously from nothing over billions of years when scientists have disproven the theory of Spontaneous Generation and Transmutation, and when these atheist evolution myths violate the established rules for hypothesis and the

established laws of science infringes upon Plaintiffs' first amendment rights.

95.    Teaching that one "species" mutates into another, when this is scientifically disproven and in direct contradiction to Plaintiffs' religious beliefs, violates Plaintiffs' first amendment rights.

96.    Hypothesis that meet all the requirements of being a scientific hypothesis cannot be formed about the origins of the Universe and the origins of the life within the Universe and therefore must be limited to classes on religion and philosophy—in which all creation stories from all religions should be presented as equal. When public school teachers falsely claim the Theory of Evolution to be "scientific truth" and teach it as such in public schools, they violate first amendment rights by establishing a state, atheist religion.

97.    Defendants' evolution teaching guidelines were originally added to school curriculums precisely because they promote Atheism.

98.    Defendants' evolution teaching guidelines do nothing to improve and much to harm science education in school. It promotes scientific fallacies of "affirming the consequent" where students are encouraged to seek evidence to confirm a hypothesis instead of disproving them, it promotes the fallacy of "false analogy" where students are taught to assume that because animals share a few characteristics with humans then they must share other characteristics with them, and it promotes the fallacy of "confirmation bias" where students are taught to favor the data that supports the Theory of Evolution's hypothesis.[3]

99.    Unless an injunction issues from this Court, Plaintiffs will continue to suffer irreparable harm from the Defendants' teaching of evolution.

---

[3]
https://www.realclearscience.com/blog/2017/03/13/common_logical_fallacies_committed_by_scientists.html

# V.   CAUSES OF ACTION

## COUNT I: VIOLATION OF THE ESTABLISHMENT CLAUSE OF THE FIRST AMENDMENT OF THE CONSTITUTION OF THE UNITED STATES

100.   The actions of the Defendants, as set forth above, which are fully incorporated herein, entitle plaintiffs to relief under 42 U.S.C.§1983 because Defendants, acting under color of state law, subjected plaintiffs to a deprivation of their rights under the Establishment Clause of the First Amendment of the Constitution of the United States, as applied to the states by the Fourteenth Amendment.

101.   The Indiana Department of Education's guidelines for teaching evolution facially and as applied violate the Establishment Clause of the First Amendment to the United States Constitution, including in the following ways: The teaching of evolution or any other origin theory has no secular purpose. Forcing students to use unscientific methods with the sole goal of proving that the universe happened spontaneously in violation of the laws of science detracts from the science education of students and misleads them about hypothesis and bias. The purpose and effect of teaching the Theory of Evolution is to endorse the specific religious viewpoints and beliefs of atheists. Students are not informed of any of the flaws or weaknesses in the Theory of Evolution. The Defendants' guidelines suggest to students that the Theory of Evolution is scientific and truth while at the same time suggesting any students' diverse religious beliefs about the origins of the world are false. The Defendants are thereby preferring the religious beliefs of atheists over the religious beliefs of Christians and students of other religions.

102.   The Defendants' evolution teaching guidelines promote religious views that are not adhered to by the Plaintiffs as well as to other students and their families, and invades the Plaintiffs' prerogative to instruct their children about their beliefs with respect to religion. The

Plaintiffs perceive the Defendants' actions as conveying a governmental message that students should subscribe to Atheism and the views reflected about the origins of the earth in the Theory of Evolution. The Plaintiffs feel harmed, intimidated, and distressed by the Defendants' endorsement and promotion of religious views which they feel should not be taught in public school.

103.    The Defendants' evolution teaching guidelines results in excessive entanglement of government and religion, coerced religious instruction, and an endorsement by the state of Atheism over other religious views and of one religious viewpoint over others. The Defendants evolution teaching guidelines also result in an excessive entanglement of government and religion because, for example, the Penn-Harris-Madison teachers must field questions about conflicts between religious beliefs and the Theory of Evolution and according to the guidelines must do so in a way that supports Atheism and suppresses Christianity and the belief that the Bible is the inerrant and infallible inspired Word of God. Any subject—whether history, philosophy, or science that teaches evolution requires a continuing involvement of state officials, who not only have encouraged the teaching of Atheism but who also are necessitating that teachers of evolution become spiritual guides for students and answer religious questions that any discussion on origins would include.

104.    The Defendants' Evolution guidelines violate Jason and Jennifer Reinoehl's rights under the Establishment Clause by subjecting their children to an unwelcome government endorsement of the religion of Atheism that has caused and will continue to cause them irreparable harm. To avoid this harm, Plaintiffs have to provide private education for their children.

105.    The Defendants' Evolution guidelines violated Sarah Reinoehl's rights under the Establishment Clause by subjecting her to unwelcome government endorsement of the religion

of Atheism that caused her irreparable harm. To avoid this harm, Plaintiffs have to provide private education for their children.

106.    As a result of these current violations of Plaintiffs' rights under the Establishment Clause, Plaintiffs are entitled to declaratory and injunctive relief.

## COUNT II: VIOLATIONS OF THE INDIANA BILL OF RIGHTS ARTICLE 1, SECTION 3

107.    The actions of the Defendants, as set forth above, which are fully incorporated herein, violate, both facially and as applied, Article 1, Section 3 of the Indiana Bill of Rights. The purpose of the Defendants' evolution teaching guidelines is to advance and endorse religion and a particular religious viewpoint. The Defendants' evolution teaching guidelines succeed in doing so, resulting in an excessive entanglement of government in religion, coerced religious practice, and an endorsement by the state of Atheism over other religions. The Defendants' requirements for teaching evolution also represent an impermissible appropriation of state funds for the purposes of sectarian education.

108.    As a result of these current violations of Plaintiffs' rights under the Indiana Bill of Rights, Plaintiffs are entitled to declaratory and injunctive relief.

## VI.    PRAYER FOR RELIEF

**WHEREFORE**, in light of the foregoing, Plaintiffs respectfully request the following:

A. a declaratory judgement pursuant to 28 U.S.C. §2201 and §2202 and 42 U.S.C.§1983 declaring that the Defendants' requirements for teaching Evolution violates the Establishment Clause of the First Amendment of the Constitution of the United States and Article 1, Section 3 of the Indiana Bill of Rights;

B. an injunction pursuant to Fed.R.Civ.P. 65 prohibiting the Defendants from teaching the Theory of Evolution or causing it to be taught in any public school and removing all literature

and media promoting or describing the Theory of Evolution from public school science
classrooms;

C. damages against the Defendants for violating the Plaintiffs' rights under the First and
Fourteenth Amendments of the United States Constitution and Article 1, Section 3 of the Indiana
Bill of Rights;

D. an order awarding Plaintiffs costs incurred in this litigation; and

E. any and all other relief the Court deems just and proper in the premises.

Respectfully submitted,

Jennifer Reinoehl

Pro se Litigant

Sarah Reinoehl

Pro se Litigant

Jason Reinoehl

Pro se Litigant

Jennifer Reinoehl    5/23/23
51860 Cheryl Dr.
Granger, IN, 46530
574-302-6088
E-Mail: commercialsonly@juno.com
Pro se Litigant

## Verification.

I, the undersigned, hereby swear or affirm, under penalties of perjury that the foregoing

statements are true.

**Jennifer Reinoehl**

Pro se Litigant

**Sarah Reinoehl**

Pro se Litigant

**Jason Reinoehl**

Pro se Litigant

**Dated May 23, 2023**

Respectfully submitted,

**Jennifer Reinoehl,** Pro se Litigant
51860 Cheryl Dr.
Granger, IN, 46530
574-302-6088
E-Mail: commercialsonly@juno.com